S & M PAVING, INC., Plaintiff,

v.

The CONSTRUCTION LABORERS PEN-
SION TRUST OF SOUTHERN
CALIFORNIA, Defendant.

Alan C. ELLS, Plaintiff,

v.

The CONSTRUCTION LABORERS PEN-
SION TRUST OF SOUTHERN
CALIFORNIA, Defendant.

Nos. 81-5929 TJH, 81-4910.

United States District Court,
C. D. California.

April 12, 1982.

Wayne A. Hersh, Van A. Goodwin, Mer-
rill, Schultz & Hersh, Newport Beach, Cal.,
for plaintiffs Ells and S & M Paving.

James Watson, Howard A. Kroll, Cox,
Castle & Nicholson, Los Angeles, Cal., for
defendant Construction Laborers Pension
Trust.

OPINION

HATTER, District Judge:

I.

BACKGROUND

This action concerns the validity of the
Multiemployer Pension Plan Amendment

Act of 1980 (MPPAA) (29 U.S.C. § 1381 et seq.). That Act amended the Employee Retirement Income Act of 1974, commonly known as ERISA.

Prior to ERISA, numerous private pension plans had experienced difficulty providing promised retirement benefits for their employees. In 1974, Congress attempted to rectify this problem by creating a multiemployer pension plan system under ERISA. ERISA provided for minimum vesting and funding schedules and established a centrally administered insurance fund to protect employees in the event of plan termination. See 29 U.S.C. §§ 1001–1144, 1301–1381.

Under ERISA-sponsored multiemployer plans, the pension benefits an employee could receive were not directly tied to the actual contributions made by his employer. Thus, the funds held in trust by each plan did not always equal the amount of vested pension benefits that had accrued and were outstanding. The difference between the two amounts was known as the unfunded vested liability. Under the initial ERISA program, an employer became liable to pay this unfunded vested liability only if a plan terminated or if he withdrew from a plan within five years of its termination. Many employers were thus encouraged to withdraw from these plans, knowing that the chances of their incurring liability for the unfunded vested benefits were fairly remote.

In 1980, Congress plugged this loophole by passing the MPPAA. That Act made employers liable for any unfunded vested benefits that might exist at the time of withdrawal. 29 U.S.C. § 1381. Although the MPPAA was enacted on September 26, 1980, it was made effective as of April 29th of that year.

The plaintiffs in this case, Alan C. Ellis Construction, Inc. and S & M Paving Company, had established employee pension plans under the terms of their collective bargaining agreements with the Council of Laborers of Southern California (the Union). These plans were administered by the Construction Laborers Pension Trust (the Trust) which is the defendant in this action. Both Ells and S & M Paving terminated their collective bargaining agreements with the Union around July 1, 1980. Both, however, continued their pension fund contributions until at least December 1980. At that point, negotiations with the Union reached an impasse and pension contributions ceased.

In August 1981, the Trust notified plaintiffs that they were subject to substantial withdrawal liability under the MPPAA. Plaintiffs were given the option of making one lump sum payment or monthly installments. They responded by filing this action challenging the constitutionality of the MPPAA and seeking to have this Court permanently enjoin the Trust from further prosecution, enforcement or collection of the withdrawal liability claims. Although plaintiffs challenge the MPPAA on a number of constitutional grounds, only two of those grounds merit discussion here. They involve the Contracts Clause and Due Process Retroactivity.

## II

### THE CONTRACTS CLAUSE

Plaintiffs claim the MPPAA unconstitutionally impairs the terms of both the collective bargaining agreements with the Union and the Trust Agreement which established the Construction Laborers Pension Trust. Specifically, the collective bargaining agreements provide that plaintiffs' liability with respect to the Trust "has been and remains limited exclusively to payment of the contributions specified from time to time in the Collective Bargaining Agreements." The Trust Agreement likewise provides that:

The Individual Employers shall not be required to make any further payments or contributions to the cost of operation of the fund or of the pension plan except as may be hereafter provided in the collective bargaining agreements.

Plaintiffs argue that the MPPAA, by imposing *additional* liabilities not covered in these agreements, "totally abrogated" this contractual relationship.

Plaintiffs' contentions, however, have no support either in law or in fact. Their contractual relationship was not abrogated by the MPPAA, but by the *parties themselves*. This occurred when the collective bargaining agreement was terminated in July 1980, several months prior to the passage of the MPPAA. Nor are plaintiffs in any position to argue that the collective bargaining agreement defined or could limit their entire obligation to the Trust. In *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729 (9th Cir. 1978), the district court had ruled that the plan in question was an individual account plan and, therefore, not subject to termination insurance coverage under ERISA. In reaching this conclusion, the court had looked only at the language in the employer's contractual obligation. The Ninth Circuit reversed and held that the plan was not an individual account plan because contributions were pooled into a common fund. *Id.* at 733. The court also held that liability under the plan had to be defined by reference to the appropriate ERISA statutes, and not solely by the collective bargaining agreement. *Id.* at 732.

While *Connolly* involved a different factual situation than the present case (i.e., termination insurance versus withdrawal liability), its rationale is particularly appropriate. It held, in effect, that parties could not shield themselves from a statutory obligation simply by putting what amounted to disclaimer clauses in their contractual agreement.

Assuming plaintiffs could somehow surmount these hurdles, they would then be confronted with the language of the Contracts Clause which reads:

No *State* shall ... pass any ... law impairing the Obligation of Contracts.

U.S. Const., Art. I, § 10. Emphasis added.

Despite this express limitation, plaintiffs argue that the Contracts Clause should be applied to the Federal Government as well as the states. The genesis of this idea can be found in *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). There, the Court held that:

Rights against the United States arising out of a contract with it are protected by the Fifth Amendment.

*Lynch*, however, dealt with a contract formed between an individual and the United States. It did not deal with a *legislative enactment* of the Federal Government which adversely affected a contract between two or more private parties. Nevertheless, some courts and commentators began reading *Lynch* as if it did. They observed that since the Fifth Amendment prohibits the Federal Government from impairing contracts, that restriction is essentially the same as that imposed by the Contracts Clause on the states. This meant that, in essence, the Contracts Clause could be said to apply to Congress as well as the states. *E.g., The Supreme Court and the Contract Clause: III*, 57 Harv.L.Rev. 852, 890–91 (1944); *Rivera v. Patino*, 524 F.Supp. 136, 143 (N.D.Cal.1981) ("The [Contracts Clause] operates against the Federal Government through the due process clause of the fifth amendment." *Lynch* was cited for this proposition.); *City of New Brunswick v. Borough of Milltown*, 519 F.Supp. 878, 883 (D.N.J.1981) (Fifth Amendment provides a "similar measure of protection" as does the Contracts Clause).

The Ninth Circuit, however, has apparently refused to endorse this approach. In *Todd Shipyards Corp. v. Witthuhn*, 596 F.2d 899, 903 (9th Cir. 1979), the court observed that "the Supreme Court has never held the Contract Clause applicable to federal as opposed to state action." The D. C. Circuit also seems to be in accord. In *Larionoff v. United States*, 533 F.2d 1167, 1179–80 (D.C. Cir.1976), *aff'd*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), the court noted that:

Since *contractual rights against the government* are property interests protected by the Fifth Amendment, Congressional power to abrogate existing contracts is narrowly circumscribed. [cites *Lynch* ] And although Congress may constitutionally impair existing contract rights in the exercise of a paramount governmental power such as the 'War Powers,' Congress is 'without power *to*

*reduce expenditures* by abrogating contractual obligations of the United States.' Emphasis added. Citations omitted.

This appears to be a more accurate interpretation of *Lynch.* It also is in harmony with the Supreme Court's own reading of that case. In *Thorpe v. Housing Authority,* 393 U.S. 268, 279, 89 S.Ct. 518, 524, 21 L.Ed.2d 474 (1969), the Court had little difficulty upholding a HUD regulation even though it had an adverse impact on the contractual expectations of various parties. But, the Court was quick to note that:

> A far different case would be presented if HUD were a party to this suit arguing that it could repudiate its obligations under the annual contributions contract
> . . . .

*Id.* at n.33, 89 S.Ct. 524 at n.33. *Lynch* was cited for this proposition.

The Supreme Court thus made a basic distinction between the case of the Federal Government abrogating *its own* contract and that of a legislative or Congressional enactment which adversely impairs a contract because it alters the legal ground rules upon which that contract was originally predicated.

This distinction is critical to understanding why the Contracts Clause should only apply to the states. Whenever Congress enacts legislation that otherwise would pass constitutional muster, it is acting pursuant to a "paramount governmental power." The same cannot be said for state legislation.

The Supreme Court has repeatedly emphasized that private interests or expectations cannot be used to frustrate the legitimate exercise of these Congressional powers. For instance, in the field of interstate commerce, the Court noted that:

> [A]nything which directly obstructs and thus regulates that commerce which is carried on among the States, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce.

*Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 230, 20 S.Ct. 96, 103, 44 L.Ed. 136 (1899). *Accord, Louisville & Nashville R. Co. v. Mottley,* 219 U.S. 467, 482, 31 S.Ct. 265, 270, 55 L.Ed. 297 (1911) (contracts may be impaired by subsequent Congressional legislation). For this reason, plaintiffs' argument that the restrictions of the Contracts Clause should be applied to Congressional legislation cannot withstand analysis.

Even if the MPPAA were to be scrutinized under this Clause, it could still pass muster. Plaintiffs place primary reliance on the leading Contracts Clause case of *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). There, the Supreme Court struck down a Minnesota statute which required employers who closed down certain plants to pay pension benefits to employees who previously had no vested rights to such payments.

*Spannaus* can easily be distinguished from the present case. The Minnesota Legislature was dealing in a new area of regulation. In this case, Congress was not. ERISA had been in effect since 1974. The MPPAA merely amended its withdrawal provisions. Secondly, the Minnesota law only dealt with a very limited number of employers—those with at least 100 employees at least one of whom resided in Minnesota. The MPPAA, on the other hand, is broad-based legislation which is applicable to all employers who withdraw from multiemployer pension plans. Third, the Minnesota law imposed the obligation to fund vested pension rights for individuals who previously had no such rights. It was characterized by the Court as nullifying "express terms of the company's contractual obligation." *Id.* at 234. This was done by shortening the contractual time period required for vesting. By contrast, the MPPAA only required funding for pension benefits that were already vested. It did not change the vesting requirements already written into plaintiffs' prior agreements.[1]

---

1. *Accord, Pension Benefit Guaranty Corp. v. Ouimet Corp.,* 470 F.Supp. 945 (D.Mass.1979),     the court noted that:

Nor can plaintiffs successfully argue that their limitation-of-liability language should be treated with the same dignity as a contractual term defining an employee's vesting requirements. Several courts have already analogized a vested pension right to an irrevocable offer by the employer that cannot be negated by disclaimer language. *E.g., Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 956–57 (D.Mass.1979) (and cases cited therein).

In addition, the language used throughout *Spannaus* indicates that the Supreme Court was focusing exclusively on *state* legislation. For instance:

> The severity of the impairment measures the height of the hurdle the state legislation must clear.

438 U.S. at 245, 98 S.Ct. at 2722.

> If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships . . . .

*Id.* at 242, 98 S.Ct. at 2721.

Even Justice Brennan's *Spannaus* dissent, from which plaintiffs attempt to seek solace, undercuts their position. He stated that:

> The terms of the Contract Clause negate any basis for its interpretation as protecting all contract-based expectations from unjustifiable interference. It applies, as confirmed by consistent judicial interpretations, only to *state legislative* Acts. Its inapplicability to impairments

by state judicial acts or by national legislation belies interpretation of the Clause as intended broadly to make all contract expectations inviolable.

*Id.* at 257–58, 98 S.Ct. at 2728–29 (Brennan, J., dissenting). Citations omitted.

For these reasons, plaintiffs' claim that the MPPAA violates the Contracts Clause must be rejected.

## III

### DUE PROCESS RETROACTIVITY

■ As applied to plaintiffs Ells and S & M Paving, the MPPAA is not a retroactive law. Even though their collective bargaining agreements were terminated in July, both were required to contribute to the trust fund until an impasse was reached in negotiations with the Union. *Peerless Roofing Co. v. NLRB*, 641 F.2d 734, 736 (9th Cir. 1981). This impasse apparently occurred in December, 1980 for Ells and April, 1981 for S & M Paving. Only at those times did their respective obligations to contribute to the pension fund cease. When an obligation to contribute to the pension trust no longer exists, a "withdrawal" has occurred. 29 U.S.C. § 1383(b). Thus, neither of the plaintiffs withdrew from the pension trust plan until well after the enactment of the MPPAA. Therefore, the only retroactive impact the MPPAA could have on either Ells or S & M Paving would be the effect that it had on their reliance interests and expectations at the time they entered into the collective bargaining agreements

---

The Supreme Court's decision in [*Spannaus*] does not undercut the PBGC's contention that the employer liability concepts of ERISA meet due process requirements . . . . [*Spannaus*] is at least facially distinguishable because ERISA is a federal law not subject to the strictures of the contract clause.

. . . .

. . . [*In Spannaus*] the statute imposed liability for benefits that had not vested under the terms of a plan.

*Id.* at 956, 957.

*Cf., e.g., Todd Shipyards Corp. v. Witthuhn*, 596 F.2d 899, 903 (9th Cir. 1979) (plaintiffs' prior expectation that the government would not require them to pay death benefits in the future did not give rise to vested rights which would immunize them from retroactive legisla-

tion or make the legislation infirm under the Contracts Clause); *A–T–O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1025 (6th Cir. 1980) ("Congress enacted ERISA after years of investigation into the substantial harm suffered by employees who lost, for various reasons, their retirement benefits. The widespread and serious nature of the problem is stated expressly in the findings of fact and declaration of policy . . . . The grim statistics demonstrate the compelling national problem confronted by Congress. The proven scope of the problem and the broad relief granted by Congress amply distinguishes the Minnesota Private Pension Benefits Protection Act which the Supreme Court held to violate the contract clause in *Allied Structural Steel Co. v. Spannaus*.").

that dealt with pension contributions. Would they have done so had they known that at some later time they might incur a substantial withdrawal liability?

In *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Supreme Court established the most widely-followed test for evaluating retroactive legislation. The Court noted that:

> [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful .... even though the effect of the legislation is to impose a new duty or liability based on past acts.

> It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.

*Id.* at 16–17, 96 S.Ct. at 2892–2893. Citations omitted.

In a footnote, the Court cited *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938) as an example of a case where the adverse impact of a statute on a party's reliance interest was given considerable weight in evaluating its constitutionality. 428 U.S. at 17 n.16, 96 S.Ct. at 2893 n.16. But the *Usery* Court also cited what appeared to be a conflicting line of cases which de-emphasized the reliance factor. One of them was *Louisville & Nashville R. Co. v. Mottley*, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911). There, the Court held that:

> [T]he agreement must necessarily be regarded as having been made subject to the possibility that, at some future time, the Congress 'might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value.'

*Id.* at 482, 31 S.Ct. at 270. This rationale was followed in *Norman v. B. & O. R. Co.*, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935). There, the Court upheld the power of Congress to nullify gold clauses in pre-existing contracts. The Court noted that contracts cannot be used to shield parties from "the reach of dominant constitutional power." *Id.* at 307–08, 55 S.Ct. at 415–16.

This conflict of authority, however, is more apparent than real. *Welch* relied on earlier cases which apparently found that retroactive application of new tax laws violated due process because the individuals might well have changed their conduct had they been forewarned of the new legislation. 305 U.S. at 147, 59 S.Ct. at 125. However, *Welch*, itself, does not stand for this rule. In that case, the retroactive tax did not impact a voluntary act of the taxpayer. Therefore, the reliance interests involved were minimal. *Id.*

In addition, the Court in *Welch* cited with approval *Milliken v. United States*, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931), where a retroactive gift tax was upheld "where the donor was forewarned by the statute books of the possibility of such a levy." The principle that comes out of *Welch*, then, is not that legislation is invalid if it upsets reliance interests or impacts discretionary conduct. Rather, as the *Welch* Court itself noted:

> In each case it is necessary to consider the nature of the tax [or other legislation] and the circumstances in which it is laid, before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation.

305 U.S. at 147,[2] 59 S.Ct. at 125.

Although the Supreme Court did not resolve this apparent conflict in *Usery*, it did cite the rule that legislation should not be invalidated solely because it upsets someone's "settled expectations." 428 U.S. at 16, 96 S.Ct. at 2892. The Court went on to

---

**2.** *Welch, Milliken* and *Norman* would appear to emasculate earlier decisions such as *Untermeyer v. Anderson*, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928) which invalidated retroactive legislation because of the inability of the taxpayer to reasonably anticipate the possibility that Congress might later increase the tax burden.

note that the reliance interest was a factor which "must [be taken] into account." *Id.* at 17, 96 S.Ct. at 2893.

■ Thus, it appears that the proper standard is not whether there is *any* retroactive impact that would have changed settled expectations, but whether the effects are "wholly unexpected, harsh and oppressive." *Accord, Todd Shipyards Corp. v. Witthuhn,* 596 F.2d 899, 902 (9th Cir. 1979); *Matter of U.S. Financial, Inc.,* 594 F.2d 1275, 1281 (9th Cir. 1979). Stated another way, the test would be: "Does the legislation represent a rational means to achieve legitimate ends?" *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. at 18, 96 S.Ct. at 2893.

This standard was recently amplified by the Seventh Circuit in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir. 1979), *aff'd on other grounds,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). *Nachman* involved a due process challenge to a Congressional Act which imposed retroactive liability for unfunded vested pension benefits. The Seventh Circuit upheld the constitutionality of the legislation and listed four criteria which could be used to evaluate whether the legislation could pass the ends-means test. They were:

1) the reliance interests of the parties affected;

2) whether the private interest was in an area previously subject to regulatory control;

3) the equities of imposing the legislative burdens;

4) the inclusion of statutory provisions designed to moderate the impact of the new law.

592 F.2d at 960.

■ Under the first part of the *Nachman* test, plaintiffs Ells and S & M Paving clearly have weak reliance interests. They withdrew from the pension plan after the passage of the MPPAA. They are hardly in a position to argue that the MPPAA imposed a sudden, unanticipated and wholly unexpected burden *on them.* Nor can they successfully argue that the limitation of liability clauses in their contracts afford them a sufficient reliance interest. The Supreme Court has repeatedly emphasized that parties cannot use contractual provisions to insulate themselves from the adverse effects of future Congressional enactments. In *F.H.A. v. The Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), a landlord who rented to transients signed a mortgage agreement with the F.H.A. Subsequently, the F.H.A. issued a regulation prohibiting this practice in federally financed housing projects. The landlord argued that this regulation was unconstitutional because it significantly impaired his previously established contractual expectations. Justice Douglas, writing for the majority, rejected this notion and stated that:

> Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end. Invocation of the Due Process Clause to protect the rights asserted here would make the ghost of *Lochner* walk again.

*Id.* at 91–92, 79 S.Ct. at 146.

Plaintiffs, however, argue that the balance of reliance interests is tilted in their favor. They note that the ERISA legislation which the *Nachman* court upheld applied to a single employer plan. If the single employer withdraws, there would be no other contributing employers available to assume liability for unfunded vested benefits. Since plaintiffs were part of a multiemployer plan, they reason that their withdrawal would not significantly impact the reliance interests of either the pension fund or any affected employees.

Apparently, plaintiffs feel that no reliance interests will be significantly impacted by their withdrawal as long as there is at least one employer left in the plan! That employer would then be saddled with the burden of paying for unfunded vested liabilities which his more far-sighted contemporaries avoided by their earlier withdrawals. Plaintiffs ignore the fact that the MPPAA was intended to protect not only the reliance interests of employees, but also the interests of other employers who elect

to remain in the pension plan program. Without the liability provisions imposed by the MPPAA, there would be little incentive for employers to continue in such plans. Those who did, would have to assume an ever-increasing share of the liability as the number of contributing employers decreased. Thus, plaintiffs' attempt to distinguish the result in *Nachman* on this basis is without merit.

Plaintiffs also fail to pass muster under the second *Nachman* test: whether the area was subject to previous regulation. They argue that there was no previous regulation in this field because the MPPAA imposed burdens of a wholly different type than previously existed. In addition, they claim the MPPAA vastly expanded the area of regulation. But these arguments distort the regulatory impact of the MPPAA. The area of regulation, both prior to and after the MPPAA, remained the same. It had to do with withdrawal liability and was clearly subject to regulation under the original ERISA statutes. See 29 U.S.C. § 1363 (Captioned: "Liability of substantial employer for withdrawal." Effective Sept. 2, 1974). An increase of the regulatory *burden* is not the same as creating a *new area* of regulation.

Plaintiffs' arguments in this regard should really be considered under the third *Nachman* test: the equities of imposing the legislative burden. Clearly, the burden imposed by the MPPAA on Ells and S & M Paving is heavy. But there is a countervailing public policy that is equally as compelling. The legislative history of the MPPAA shows that Congress was acutely concerned about the possibility of mass employer withdrawals from ERISA-based pension programs. In the preamble to the MPPAA, Congress found that:

> [W]ithdrawals of contributing employers from a multi-employer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries and labor-management relations, and in a declining industry, the

incidence of employer withdrawals is higher and the adverse effects described . . . are exacerbated.

29 U.S.C. § 1001a(a)(4).

When viewed from this perspective, the relative equities involved clearly do not favor plaintiffs. Congress was attempting to deal with a widespread problem which had significant social and economic ramifications. It perceived that the future stability of pension benefit funds could be jeopardized because of the ease in which employers could withdraw from such plans. The MPPAA was passed in order to plug this legislative loophole left open by the original ERISA statutes. To paraphrase the language of the Supreme Court in *Usery*, the MPPAA attempts to solve this problem rationally because it spreads the cost of providing for these vested benefits evenly among employers. See 428 U.S. at 19, 96 S.Ct. at 2894. For this Court to go further and question the merits of the particular cost-spreading scheme employed, or the underlying factual basis relied on by Congress, would be to indulge in judicial practices prevalent during the substantive due process era of *Lochner*.

In this regard, plaintiffs rely on *Railroad Retirement Bd. v. Alton R. R. Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), a decayed relic of the heyday of substantive due process. *Alton* invalidated certain provisions of the Railroad Retirement Act because it attempted to retroactively expand the number of persons eligible for pensions. *Alton*, even if it retained any vitality, can easily be distinguished on its facts. Like the Minnesota law invalidated in *Allied Steel v. Spannaus*, the statute in *Alton* attempted to greatly expand the number of workers eligible for retirement benefits. 295 U.S. at 348–49, 55 S.Ct. at 762. As discussed earlier, the MPPAA does not do this.

In addition, *Alton* has been severely criticized in a number of recent decisions regarding retroactive legislation. *E.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 19, 96 S.Ct. at 2894; *A–T–O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1025

n.13 (6th Cir. 1980); *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 955 (D.Mass.1979). Furthermore, the rationale in *Alton* was based on the old public-versus-private distinction which was expressly discarded by the Supreme Court at the onset of the due process revolution. And, finally, it is noteworthy that Chief Justice Hughes, along with Justices Brandeis, Stone and Cardozo, all dissented in *Alton.*

Plaintiffs further argue that *Usery v. Turner Elkhorn Mining Co.* can be distinguished because the coal mine operators in that case had control over conditions which caused harm to their workers. Ells and S & M Paving argue that they did not have this type of control over past harmful conditions. But this distinction is questionable. Ells and S & M Paving did have control over their employees' conditions of work, pay and retirement benefits. In addition, the holding in *Usery* was certainly not predicated on this type of "control" theory. The Court noted that even though Congress chose not to do so, it could have imposed the burden of paying black lung benefits on *all* operators, including those who had no control over the earlier conditions that led to the disabilities. 428 U.S. at 18, 96 S.Ct. at 2893. Thus, plaintiffs' "control" rationale is clearly flawed.

Plaintiffs also ignore a more accurate interpretation of *Usery* which is contained in the following language:

> [T]he imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employee's disabilities *to those who have profited from the fruits of their labor* . . . .

*Id.* Emphasis added. By the same token, the MPPAA was designed to spread the costs of employees' pensions to those who have benefitted from their labors in the past, specifically to employers such as Ells and S & M Paving.

The final criteria of the *Nachman* test involves the existence of mitigating factors. Here again, the MPPAA appears to pass muster. Even though the statute did not place an absolute limit on a withdrawing employer's liability, it did provide for the following:

1) A *de minimis* rule which eliminates liability when the amount owed by an employer is less than a fixed percentage of the plan's unfunded vested liability (29 U.S.C. § 1389(b));

2) Limitation of liability when withdrawal is due to liquidation or dissolution (29 U.S.C. § 1405);

3) The option of making installment payments;

4) A twenty-year limit on the amortization period (29 U.S.C. § 1399(c)(1)(B)).

In addition, an employer can abate its liability if it rejoins a plan after it has withdrawn. 29 U.S.C. §§ 1387, 1388. Plaintiffs Ells and S & M Paving appear to be able to satisfy this last requirement if they so desire. Both had pre-hire agreements with the Union. Both those agreements were terminated. But, both could easily be resumed even though the Union does not have majority status. 29 U.S.C. § 158(f); *NLRB v. Local Union No. 103, International Association of Bridge, Structural and Ornamental Iron Workers*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). Once this is done, contributions to the pension fund could once again be made by Ells and S & M Paving.

The fact that such a pre-hire agreement could be repudiated prior to the Union's attainment of majority status is clearly beside the point. This possibility does not eliminate the use of such an option in the first instance.

## IV

## CONCLUSION

While plaintiffs have clearly demonstrated that the MPPAA imposes hardship on them, it is not the type that was totally unanticipated. Options are available for mitigating or even abating their withdrawal liability. In addition, the MPPAA was not retroactively applied to either Ells or S & M Paving. Moreover, it appears to be a rational measure designed to allocate a cost

employers incur when doing business in a regulated field. Therefore, the Motion by the Construction Laborers Pension Trust for Summary Judgment is GRANTED and plaintiffs' Cross-Motion for Summary Judgment is DENIED.