**PACIFIC IRON & METAL
COMPANY, Plaintiff,**

v.

**WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST
FUND, Defendant.**

No. C82–653C.

United States District Court,
W.D. Washington,
at Seattle.

Oct. 13, 1982.

Eugene R. Nielson, Seattle, Wash., for appellant.

J. David Andrews, Seattle, Wash., for appellee.

COUGHENOUR, District Judge.

THESE MATTERS come on for consideration on the motions of the plaintiff Pacific Iron & Metal Company ("PIMC") for leave to amend its complaint and for summary judgment and on the motion of defendant Western Conference of Teamsters Pension Trust Fund ("Trust Fund") for summary judgment. Oral argument was not requested by either party.

PIMC is a metal salvage company. It employs yard and warehouse employees who were, until recently, represented for purposes of collective bargaining by Driver Sales and Warehouse Employees, Local 117 ("Local 117"), which is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. A collective bargaining agreement was entered into between plaintiff and Local 117 which by its terms ran from May 1, 1977, and continued in full force and effect to May 1, 1980. Pursuant to Article VII of the agreement, PIMC was required to make payments to the pension plan administered by defendant Trust Fund.

On February 25, 1980, PIMC employees represented by Local 117 filed a petition with the National Labor Relations Board ("NLRB") to decertify Local 117 as representative of the bargaining unit. On March 26, 1980, the NLRB held a decertification election. Local 117 lost the election by a vote of 19 to 12. Local 117, however, objected to PIMC's conduct during the election and moved to have the election set aside. The Regional Director of the NLRB investigated the complaint and determined on May 9, 1980, that the election results should be set aside and a new election be held. On May 29, 1980, the full board of the NLRB adopted the Regional Director's recommendation and ordered a new election.

At some point in May, Local 117 filed a document with the NLRB disclaiming any

interest in representing the PIMC employees. On May 20, 1980, the Regional Director wrote to PIMC to inform it that the petition for decertification had been withdrawn inasmuch as Local 117 had disclaimed any interest in the proceedings.

The controversy between the parties concerns pension plan payments which defendant Trust Fund claims plaintiff owes for withdrawing from the pension plan. This withdrawal liability was imposed on PIMC pursuant to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.* On February 2, 1980, defendant demanded $84,830.40 from PIMC for withdrawing from the plan. Plaintiff then filed the present action. Plaintiff claims that MPPAA was not violated, that even if the literal language of MPPAA was ˙violated, its spirit was not, and that if MPPAA was violated, the Act is unconstitutional and unenforceable.

On September 26, 1980, President Carter signed MPPAA into law. MPPAA was an amendment to the Employee Retirement Income Security Act of 1974, commonly known as ERISA, 29 U.S.C. § 1001 *et seq.* Although passed in September, MPPAA had a pre-enactment effective date of April 29, 1980. In terms of this case, the significant distinction between MPPAA and prior ERISA law is the effect of an employer's withdrawal from a multi-employer pension plan (plans where more than one employer is required to make payments based on one or more collective bargaining agreements) in regard to payments required to be made to the pension plan for unfunded vested benefits. An employee's right to collect a pension benefit is vested when it survives a pre-retirement termination of employment. *Nachman Corporation v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 363–64, 100 S.Ct. 1723, 1727, 64 L.Ed.2d 354 (1980). A plan's unfunded vested liability is the difference between the actuarial present value of the vested benefit obligations and the value of the plan's assets. Under MPPAA, a withdrawing employer is liable *on the date of withdrawal* for a proportionate share of the unfunded vested liability. 29 U.S.C. § 1381. Pre-MPPAA law imposed this obligation on a withdrawing employer only if the entire pension plan terminated within five years of the employer's withdrawal. 29 U.S.C. § 1364. Moreover, pre-MPPAA law placed a ceiling on an employer's withdrawal liability at 30% of the employer's net worth. 29 U.S.C. § 1364.

 Plaintiff first argues that it withdrew from the pension plan prior to the effective date of MPPAA. This argument is premised on finding that withdrawal from the plan occurred on the date plaintiff's employees voted to decertify the union (March 26, 1980). Plaintiff's argument, however, fails for two reasons: First, even assuming that decertification of the union constituted a withdrawal under MPPAA, the decertification was not effective until after the effective date of MPPAA. Decertification occurs when the NLRB finds that it has occurred. *See Trico Products Corp.,* 238 N.L.R.B. 1306 (1979). Whether this determination was made at the time the Regional Director wrote PIMC informing it of Local 117's disclaimer of interest, or at the time of the disclaimer itself, both occurred after the effective date of MPPAA. The "relation-back" rule of *Dow Chemical Co. v. NLRB,* 660 F.2d 637 (5th Cir.1981), is not applicable since a "fair" decertification election was not held. 660 F.2d at 655. Second, the duty to make contributions to the pension plan was not premised on the existence of the union but on the existence of the collective bargaining agreement. The contract ran until May 1, 1980. Complete withdrawal from a multiemployer plan occurs when the employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. 29 U.S.C. § 1392(a). The obligation to contribute is an obligation arising under the collective bargaining agreement. 29 U.S.C. § 1392(a)(1). The collective bargaining agreement was still in effect after the effective date of MPPAA. The union acted as agent for the PIMC employees. Termination of the agency relationship does not terminate the valid contract negotiated by the agent. Thus, the earliest effective

withdrawal date for plaintiff was May 1, 1980, and was within the application of MPPAA.

■ Plaintiff's second argument concerns its motion to amend its complaint. Plaintiff seeks leave to assert its claim that although it may have violated the literal language of MPPAA by withdrawing, it did not violate the "spirit" of the Act. In other words, MPPAA is only concerned with voluntary withdrawals from pension plans and not involuntary withdrawals. As PIMC had no choice but to cease making contributions to the pension plan considering that Local 117 ceased representing the employees, it should not be "penalized" by the assessment of withdrawal liability. The argument is allegedly buttressed by federal labor law favoring the protection of employees' right to choose their own bargaining unit and prohibiting employers from recognizing unions which no longer represent the employees.

The question is whether MPPAA was intended to distinguish between voluntary and involuntary withdrawals from multiemployer pension plans. It is true that one problem MPPAA was designed to remedy was the pre-MPPAA incentive of employers to withdraw from pension plans. Under the old system, if one employer was to withdraw from a plan, there was an incentive for all the other employers to withdraw so as to escape the possibility of the plan terminating after five years from the withdrawal of the first employer and leaving the remaining employers with a disproportionate share of the unfunded vested benefits. However, other purposes of the MPPAA were to protect the employers remaining in the plan from having a substantially increased funding obligation and to insure that the millions of employees, retirees, and their dependents would continue to receive the pension benefits promised and relied upon. 29 U.S.C. § 1001a. From the perspective of the remaining employers in the plan and of the employees who expect to receive benefits from the plan, the voluntariness of one employer's withdrawal is irrelevant. What they are concerned with is there being sufficient funds to meet the obligations of the plan. Employers do not want to be saddled with additional and disproportionate liability and employees want their benefits. There is nothing in the legislative history of MPPAA which would suggest that Congress intended to exclude involuntary withdrawals where the effect is the same as voluntary withdrawal. Plaintiff's characterization of its employees' vote to decertify Local 117 as choosing to forgo their pension benefits is unsupported. There is a significant distinction between determining to change one's present representative and making a conscious decision to abandon vested pension benefits. The employees voted to replace their representative, and even the efficacy of that vote has been put into question. Finally, the question of when withdrawal from a plan is involuntary is not so clear as to warrant the assumption that Congress intended to create a distinction. For example, if an employer withdraws from a plan when it has reached an impasse with the union it is bargaining with or when it withdraws after determining it is no longer economically wise to continue in business, is this withdrawal voluntary?

For the above-stated reasons, the Court finds that plaintiff's withdrawal was within the purview of MPPAA. Plaintiff's motion to amend is therefore DENIED as the claim plaintiff seeks to add is legally insufficient on its face. See 6 Wright & Miller, Federal Practice and Procedure § 1487 at 432–33 (1971).

■ Plaintiff's final argument concerns the constitutionality of MPPAA. PIMC asserts that MPPAA is violative of the due process clause of the Fifth Amendment because it retroactively subjects it to liability in excess of that provided for in the collective bargaining agreement. Plaintiff's position is strengthened considering that at the time it withdrew, MPPAA was not in effect. It is only MPPAA's pre-enactment effective date which brings plaintiff within the purview of the statute.

The constitutionality of MPPAA has been addressed by several of the district courts.

See *Shelter Framing Corp. v. Carpenters Pension Trust for Southern California,* 543 F.Supp. 1234 (C.D.Cal.1982); *S & M Paving, Inc. v. The Construction Laborers Pension Trust of Southern California,* 539 F.Supp. 867 (C.D.Cal.1982); *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025 (E.D. Ill.1982); *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 534 F.Supp. 1340 (E.D.Penn.1982). These courts have split on the constitutionality issue, especially as to MPPAA's pre-enactment effective date. This Court agrees with those decisions upholding the constitutionality of MPPAA.

As applied to PIMC, MPPAA is a doubly retroactive statute. First, MPPAA changes the terms of the collective bargaining agreement in its provisions for automatic withdrawal liability. Second, the pre-enactment effective date resulted in MPPAA coming into effect without allowing plaintiff an opportunity to withdraw. The appropriate analysis for retroactive legislation was set forth by the Supreme Court in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). The Court found that legislation readjusting rights and burdens is not unlawful even though its effect is to impose new duty or liability on past acts. The question is whether the legislation represents a rational means to achieve a legitimate end. *Accord Todd Shipyards Corp. v. Witthuhn,* 596 F.2d 899, 902 (9th Cir.1979).

The provisions of MPPAA as to withdrawal liability are a rational means to a legitimate end: the creation of a disincentive for employers to abandon pension plans and the protection of the interests of the employers remaining in the plan and of the employees who expect to receive their promised benefits. The cases addressing the constitutionality of ERISA as to single employer plans are directly relevant to the present action. *See Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir.), *aff'd on other grounds,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *Pension Benefit Guaranty Corp. v. Ouimet Corp.,* 630 F.2d 4 (1st Cir.), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981); *A–T–O, Inc. v. Pension Benefit Guaranty Corp.,* 634 F.2d 1013 (6th Cir. 1980). Those courts recognized that it was appropriate for Congress to impose the risks of unfunded vested benefits on the employer as opposed to the employees. The distinctions asserted by PIMC between a single employer pension plan and a multiemployer plan are not significant. *See S & M Paving, supra.*

The most difficult question in the Court's mind concerns the pre-enactment effective date of MPPAA. At the time plaintiff withdrew from the plan, MPPAA did not exist. It was over three months after plaintiff withdrew that MPPAA became law. The pre-enactment effective date of April 29, 1980, however, brought plaintiff within the reach of the Act. Plaintiff had no opportunity to assess the impact of MPPAA and to determine whether in light of MPPAA it wished to remain in the multiemployer plan.

Even considering the pre-enactment effective date, MPPAA withstands constitutional scrutiny. The pre-enactment effective date was a factor carefully considered by Congress. This was felt necessary to prevent opportunistic employers from withdrawing from their plans while Congress was still debating MPPAA. *See* 126 Cong. Rec. S10156 (July 29, 1980) (remarks of Sen. Matsunaga). MPPAA throughout its legislative history contained a provision for a pre-enactment effective date. Considering this, it was not wholly unexpected that the legislation when passed would contain such a provision. Finally, the nature of the liability imposed on MPPAA, even though the pre-enactment date denied plaintiff an opportunity to opt out of the plan and escape MPPAA's reach, is not such as to warrant it being stricken on due process grounds. Plaintiff is arguing that it should be able to take advantage of the old law which allowed it to escape liability, at least temporarily, for pension benefits promised to be paid by the pension plan in which it participated. Congress determined that such activity is harmful to pension plans and that a pre-enactment effective date was necessary

to prevent opportunistic employers from abandoning their plans and thereby negating one of the major objectives of MPPAA. Whether Congress could have developed a wiser or more practical solution is not a question of constitutional dimension. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025 (E.D.Ill.1982).

For the above-stated reasons, PIMC's motions to amend and for summary judgment are DENIED and Trust Fund's motion for summary judgment is GRANTED.