**John L. CONNOLLY et al., etc., Appellees,**

**v.**

**PENSION BENEFIT GUARANTY CORPORATION, etc., Appellant.**

**No. 76–2777.**

United States Court of Appeals, Ninth Circuit.

May 4, 1978.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 9, 1978.

Henry Rose (argued), of Pension Benefit Guaranty Corp., Washington, D. C., for appellant.

Wayne Jett, Los Angeles, Cal., for appellees.

Judith Burghardt (argued), of Dept. of Labor, Washington, D. C., amicus curiae for appellees.

Before ELY and MERRILL, Circuit Judges, and HARPER, Senior District Judge.*

HARPER, Senior District Judge.

This is an appeal by the Pension Benefit Guaranty Corporation (hereinafter referred to as PBGC) from a summary judgment entered in favor of the Board of Trustees of the Operating Engineers Pension Trust (Trustees) which exempted the Operating Engineers Pension Plan (Plan) from coverage under the insurance provisions of Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA or Act).

Federal jurisdiction over this action exists pursuant to 29 U.S.C. § 1303(f).

On December 1, 1974, the Trustees paid a termination insurance premium of $12,043.00 to the PBGC. On April 10, 1975, the Trustees applied to the PBGC for a determination that the Plan was a defined contribution plan exempt from coverage under the insurance provisions contained in Title IV of the Act, 29 U.S.C. § 1301 et seq. The PBGC informed the Trustees that the Plan was a defined benefit plan subject to the plan termination insurance coverage. Thereafter, the Trustees made a demand for return of their termination insurance premium, which was refused by PBGC.

On June 17, 1975, the Trustees filed a complaint in the district court for a declaratory judgment, damages and injunctive relief against the PBGC, challenging its determination that the Plan was a defined benefit plan subject to insurance coverage. Upon cross motions for summary judgment, the district court granted summary judgment in favor of the Trustees. *Connolly v. Pension Benefit Guaranty Corp.,* 419 F.Supp. 737 (D.C.Calif.1976). In its order the district court declared the Plan to be a defined contribution plan exempt from insurance coverage under the Act, enjoined the PBGC from acting inconsistently therewith, and required the PBGC to return the Trustees' premium payment. *Connolly v. PBGC, supra* at 741–42. This appeal followed.

Initially it should be noted that the determination of the PBGC herein is entitled to great deference in the construction and application of ERISA. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In *General Electric v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), quoting from *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Supreme Court stated:

" 'We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their

* The Honorable Roy W. Harper, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which gave it power to persuade, if lacking power to control.' "

■ The Operating Engineers Pension Trust is a joint labor-management trust established in conformance with § 302(c)(5) of the Labor Management Relations Act of 1947, as amended in 1959, 29 U.S.C. § 186(c)(5). This trust was created in 1960 by agreement between eleven home builders associations and the International Union of Operating Engineers. The trust agreement created the multiemployer pension plan at issue here. The Plan is a tax qualified employee pension plan within the meaning of § 4021(a)(2) of ERISA, 29 U.S.C. § 1321(a)(2). It is administered by a fourteen-member Board of Trustees appointed in equal part by the employers and the union. The individual plaintiffs are the trustees of the trust. The purpose of the trust is to create a pension fund to which a number of employers make contributions and from which their employees may draw benefits when they reach a stated age of retirement.

Under the pension trust, the employers periodically enter into collective bargaining agreements to establish the amount of their contribution to the Plan. In fulfillment of their obligation under those agreements, the employers contribute a certain amount of money to the Plan each month. The amount contributed by each employer is determined by multiplying their employees' hours of service by a rate specified in the current agreement.

The monthly amount of the pension payable to an eligible participant is determined by multiplying the Pension Factor in the Plan by the employee's Pension Credits and Prior Service Credits. The Pension Factor is an actuarial tool, calculated to translate plan experience into retirement benefits. In setting the Pension Factor, the Trustees take into account the investment income, gains and losses, expenses, any forfeitures by participants, the mortality experience of the Plan and any variance between actual and anticipated employer contributions and delinquencies. The Pension Factor is periodically revised by the Trustees.

The Pension Credit is a service-related formula determined in part by the amount of time spent on the job by the participant. The Plan also provides for some participants to be entitled to Prior Service Credits, for time spent on the job prior to the execution of this trust and Plan. Pension Credits are earned even if the employer fails to contribute the full amount of his obligation. The employee receives the appropriate pension benefit, as calculated by the above described formula, even though sufficient contributions have not been made on his behalf by his employer to the Plan.

By the express terms of the Plan, the employer's sole obligation to the pension fund is to pay such contributions as required by the collective bargaining agreements. The trust agreement clearly states that the employer's obligation for pension benefits to the employee is ended when the employer pays the appropriate contribution to the fund. This is true even though the contributions agreed upon are insufficient to pay the benefits under the Plan.

ERISA is the product of several years of legislative effort to improve the American pension system. ERISA is a complex piece of legislation which addresses itself to many problems. One of the foremost concerns of Congress in enacting the Act was to assure workers that retirement benefits would be available when needed. 29 U.S.C. § 1001(a), (c) provides:

"The Congress finds that . . . owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their

beneficiaries have been deprived of anticipated benefits   .   .   .

"It is hereby further declared to be the policy of this Chapter to protect   .   .   . the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to   .   .   .   meet minimum standards of funding, and by requiring plan termination insurance."

Consistent with ERISA's remedial function, Congress sought to effectuate the purpose of the Act as far as possible.   In a report accompanying an earlier version of the bill, the Senate Committee on Labor and Public Welfare stated:

"It is intended that coverage under the Act be construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs.   Conversely, exemptions should be confined to their narrow purpose."

S.Rep.No. 93–127, 93d Cong., 1st Sess. 18 (1973);   U.S.Code   Cong.   &   Admin.News 1974, p. 4854.

The issue before the Court is whether the Plan is a defined benefit plan under 29 U.S.C. § 1002(35) or an individual account or defined contribution plan under 29 U.S.C. § 1002(34).   If the Plan is a defined benefit plan, it is covered by the termination insurance provisions of the Act.   If it is an individual account or defined contribution plan it is not covered by the termination insurance provisions, 29 U.S.C. § 1321(b)(1), unless the Plan is a "plan under which a fixed benefit is promised if the employer or his representative participated in the determination of that benefit." 29 U.S.C. § 1321(c)(1).   By definition, any plan that is not an individual account or defined contribution plan, must necessarily be a defined benefit plan.   29 U.S.C. § 1002(35).

The district court ruled that the Plan is a defined contribution plan, not subject to termination insurance coverage under ERISA.   This determination is erroneous.

In its decision the district court looked to the obligation which the employers participating in the Plan have contractually agreed to assume.   Because the employers have agreed only to make specified contributions, and have disclaimed any obligation to pay any pension benefit, the district court held that the plan was a defined contribution plan under which no fixed benefit is promised.   The district court reached its conclusion by considering that to subject the Plan to ERISA's termination insurance provisions would force upon the employer a greater obligation and liability than he had originally agreed to in his contract.   *Connolly v. PBGC,* 419 F.Supp. at 740.

However, this is precisely what the termination insurance provisions of the Act were intended to do.   Whenever the PBGC pays pension benefits to participants of defined benefit plans which have terminated with insufficient assets to pay the benefits promised, (29 U.S.C. § 1322), the PBGC is entitled to recover the amount of such benefits from the employers who maintained the terminated pension plan, up to an amount not exceeding thirty percent of the net worth of each employer involved.   29 U.S.C. §§ 1362–1368.   The precise intent of these sections was to impose substantial, new, and in some cases retroactive liabilities upon the contributing employers of the plan.

29 U.S.C. § 1321(b) provides that termination insurance coverage does not extend to any plan,

"(1) which is an individual account plan, as defined in paragraph (34) of section 1002 of this title   .   .   ."

29 U.S.C. § 1002(34) provides:

"The term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."

The statutory definition of an individual account or defined contribution plan contains two requirements. The first requirement is that a plan must provide for an individual account for each participant. The second requirement is that a participant's benefit must be based solely on the amount in his account. Neither. of these requirements is satisfied by the Plan. The Plan does not provide for an individual account for each participant. Contributions on behalf of participants are pooled in a general fund. While a record of contributions received on behalf of a participant is maintained by the Trustees, the participant has no right, title, or interest in these amounts. Under the structure of the Plan, no purpose is served in providing an individual account for each participant. The amount of a participant's benefit at retirement is not based on the amount of contributions paid on his behalf into an account. Rather the benefit is determined by a service related formula, Pension Credits plus Prior Service Credits multiplied by the Pension Factor. The participant is entitled to receive that amount even though a sufficient amount of contributions has not been made on the participant's behalf.

The legislative history of ERISA clearly demonstrates that the primary purpose for termination insurance is to insure the payment of benefits in the event a plan terminates before it is fully funded. Legislative History of the Employee Retirement Income Security Act of 1974, at 213, 1830–31, 1865–72, 2361, 3371, 3373, 4802 (1976) (hereinafter cited as *Legis.Hist.*)

> "The termination insurance program is intended to work hand-in-hand with the minimum funding standards imposed by the bill, since the latter will limit the losses due to plan termination by requiring more adequate funding of pension plans."

*Legis.Hist.* at 1094.

■ In the case of a true individual account plan, there is no possibility that the plan would terminate while being underfunded. Under such a plan, a separate account is kept for each covered employee, and the employee's accrued benefit at all times is simply "the balance of the individual's account." 29 U.S.C. § 1002(23)(B). Thus by definition, an individual account plan can never be underfunded. Consequently, the funding provisions of ERISA, subject to certain exceptions, do not apply to such a plan. 29 U.S.C. § 1081(a)(8). Individual account plans are excluded from ERISA's funding rules because these plans do not specify any benefit beyond the balance of each individual's account at the time it is disbursed.

For a similar reason, an individual account plan is also excluded from termination insurance coverage. 29 U.S.C. § 1321(b)(1). Congress concluded that in the case of a true individual account plan there was no need for termination insurance, just as there was no need for rules as to the funding of such an account. Since the participant is merely entitled to benefits determined by his own account, there is no unfunded amount to insure. *Legis.Hist.* at 1149.

Defined benefit plans, on the other hand, are subject to being underfunded for a variety of reasons because the benefits are not defined as the eventual balance in the individual's account. A defined benefit plan may provide benefits for service prior to the inception of the plan. In such a case, these prior service benefits need not be funded immediately, but may be amortized over thirty or forty years. 29 U.S.C. § 1082(b)(2)(B). As stated earlier, the Plan at issue provides for benefits for service prior to the inception of the plan, and the Plan is presently underfunded because *inter alia* of these promised benefits.

A funding deficiency in the Plan may also occur when the Trustees, through the use of the Pension Factor, establish pension benefits in excess of the amount of contributions received during the term of the collective bargaining agreement. Under the type of plan involved herein, if actuarial assumptions and calculations used in establishing the Pension Factor are correct as of the beginning of the term of the collective bargaining agreement, and the agreed upon

employer contributions are adequate and paid when required, there would be no funding deficiency by reason of miscalculation during the term of the collective bargaining agreement. However, when anticipated contributions, relied upon in establishing benefits, exceed actual contributions unfunded liability may occur.

The risk of termination of a multiemployer Taft-Hartley pension plan, such as the plan before the Court, is significantly less than in a single employer plan, because of its larger economic base. Indeed, an effort was made to exempt multiemployer plans from funding and/or termination insurance because of their relatively remote likelihood of termination. However, these proposals for outright exemption of multiemployer plans were rejected. Collectively bargained multiemployer plans were not exempted from the requirement that unfunded past service liability be amortized. Rather, such plans were granted an additional ten years beyond the standard thirty-year period within which to amortize the unfunded past service liability. 29 U.S.C. § 1082(b)(2)(B).

"This recognizes that multiemployer plans generally have an added element of financial strength in that their contributions come from a number of employers who as a group are less likely than comparable single employers to experience business difficulties."

*Legis.Hist.* at 3317.

Recognition of the financial strength of a multiemployer plan is also contained in ERISA's insurance program. With respect to termination insurance, the statutory multiemployer plan premiums were established at one-half the rate for single employer plans. 29 U.S.C. § 1306(a)(3)(B). The multiemployer plan's lower risk of termination was apparently sufficient to justify a different premium rate; however, it was not sufficient to warrant total exemption from termination insurance coverage.

"In view of the relatively minor incidence of multiemployer plan terminations the conferees determined to delay mandatory coverage of multiemployer plan terminations until January 1, 1978, but to

commerce premium payments by such plan as of date of enactment to build up reserves in the event the Pension Benefit Guaranty Corporation extends discretionary coverage prior to that date. It is to be expected that this discretionary coverage will be extended fully to protect employees benefits in multiemployer plans.

"The conferees had no intention whatsoever of treating workers in these plans as 'second-class citizens' and are determined that benefits be fully protected to the statutory limits regardless of the type of plan involved."

*Legis.Hist.* at 4767.

The district court also held that 29 U.S.C. § 1321(c)(1) was applicable to the Plan. 29 U.S.C. § 1321(c)(1) provides:

"For purposes of subsection (b)(1) of this section, the term 'individual account plan' does not include a plan under which a fixed benefit is promised if the employer or his representative participated in the determination of that benefit."

The district court reasoned that the independent fiduciary duties of the Trustees necessarily precluded any characterization of the Trustees as employer representatives participating in the determination of pension benefits. *Connolly v. PBGC,* supra at 741.

In light of this Court's determination that the plan is not an individual account plan, and thus not exempt from termination insurance under 29 U.S.C. § 1321(b)(1), we do not reach the issue of whether 29 U.S.C. § 1321(c)(1) is applicable to the case at bar.

The district court's decision to proceed with the statutory construction issue without convening a three-judge court was permissible. See *Hagans v. Lavine,* 415 U.S. 528, 543–44, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

■ The constitutional issues sought to be raised by the plaintiffs were not reached in the district court, and thus not properly before this Court. At this time, the Court makes no ruling with respect to any constitutional issues which the parties may wish to present on remand. Generally, a review-

ing Court should remand a case to the district court for consideration of a question not previously considered there. *Boire v. Miami Herald Publishing Co.,* 343 F.2d 17, 25 (5th Cir.), *cert. denied* 382 U.S. 824, 86 S.Ct. 56, 15 L.Ed.2d 70 (1965). This Court holds only that: The Plan involved herein is not an individual account plan as defined by 29 U.S.C. § 1002(34) and thus not exempt from the termination insurance program under 29 U.S.C. § 1321(b)(1); and that the employer's disclaimer of liability for the payment of benefits does not convert the Plan into an individual account plan.

Accordingly, this case is Reversed and Remanded.