**In re GRAY–GRIMES TOOL COMPANY, INC. PENSION PLAN.**

**PENSION BENEFIT GUARANTY CORPORATION, Applicant,**

**v.**

**GRAY–GRIMES TOOL COMPANY, INC., Elway P. Gray, Individually, as President, Director, and Sole Shareholder of Gray Grimes Tool Company, Inc., and Doing Business As: Last Word Sales Company, Respondents.**

Civ. A. No. 80–60058.

United States District Court, E. D. Michigan, S. D.

July 15, 1982.

Henry Rose, James N. Dulcan, Lois E. Bruckner, Jeanne E. Loar, Pension Ben. Guar. Corp., Washington, D. C., for applicant.

Phillip B. Maxwell, Birmingham, Mich., for respondents.

1. The Plan is contained in two documents: a Retirement Plan pamphlet distributed by Gray-Grimes to its employees, and Group Annuity Contract No. GA–2356 issued by Aetna.

2. For example, an employee who earned $11,-000 during the contract year would earn a future service retirement annuity worth $77.00

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This action arises under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1301 *et seq.* (1976) ("ERISA") (*amended by* the Multiemployer Pension Plan Amendments Act of 1980, Pub.L.No.96–364, 94 Stat. 1208). The case is now before the court on cross-motions for summary judgment. For the reasons given below, the motion of the applicant Pension Benefit Guaranty Corporation is granted, and the motion of the respondents, Gray-Grimes Tool Co., Elway P. Gray, and Last Word Sales Co., is denied.

## FACTS

On June 1, 1967, the Gray-Grimes Tool Company of Detroit (Gray-Grimes or Company) established a retirement income plan (Plan) for its' employees. The Plan was established unilaterally by the Company and was not the result of any collective bargaining negotiations. Gray-Grimes paid the entire cost of the Plan which was funded through a group annuity contract with Aetna Life & Casualty Insurance Co., of Hartford, Connecticut.[1]

The Plan promised benefits of two types: future service retirement annuities for work performed after June 1, 1967, and past service retirement annuities for work performed prior to June 1, 1967.

The benefit formulas were based strictly on earnings. Future service retirement benefits (for service on and after June 1, 1967) were calculated as follows: during each year that an employee was a member of the Plan, the Company would purchase a yearly retirement annuity for that employee worth ($\frac{1}{2}$% of the first $6,600) plus (1% of earnings in excess of $6,600). On retirement, the total *yearly* future service retirement annuity would equal the sum of the annuities purchased for each working year.[2]

per year: ($\frac{1}{2}$% of $6,600) plus (1% of $4,400). If the employee worked for the Company for 10 years at that wage, he would be entitled to a *yearly* annuity payment on retirement of $770.00: (10 years times $77.00 earned per year).

Past service retirement benefits were computed in the same manner: for each year prior to June 1, 1967 that an employee had worked for the Gray-Grimes, up to a maximum of 10 years, the Company would purchase a yearly retirement annuity for that employee worth ½% of the employee's basic annual wage on June 1, 1967.[3]

Upon retirement at the normal age of 65,[4] an employee's *yearly* retirement annuity would equal the sum of all *yearly* future service retirement annuities earned plus the *yearly* past service retirement annuity, if any.[5]

The *cost* to Gray-Grimes to purchase individual annuities varied according to the age and sex of the individual employee. For example, the annual premium for a yearly future service retirement annuity of $120 would be $340.80 for a 30-year old male employee, and $416.40 for a 30-year-old female employee. The same $120 yearly future service retirement annuity would cost Gray-Grimes $714.00 for a 50-year-old male employee and $874.80 for a 50-year-old female employee.[6] Premiums for past service retirement annuities were also based on sex and age.[7]

In practice, Gray-Grimes remitted a monthly premium to Aetna, based on the total earnings of all Plan participants, to purchase future service retirement annuities. At the end of the contract year, Aetna would calculate the total premium required to purchase all future service benefits earned during that year, and then bill Gray-Grimes or credit its account accordingly.

Aetna maintained annuity record cards for each participant in the Plan. The cards listed 1) the monthly annuity earned during a particular contract year (and the total year-to-date monthly annuity earned); 2) the employee's contract year earnings; and 3) the annual premium charged for a particular contract year (and the total year-to-date premium charged).

As for past service retirement annuities, Gray-Grimes was entitled under the contract to remit premiums at such times and in such amounts as it deemed proper, so long as an individual's past service retirement annuity was fully purchased by the time he or she retired. Aetna applied premiums paid for past service retirement annuities to Plan participants in the order of their nearness to the normal retirement age.

The contract provided that when an employee retired, he would be entitled to an "annuity payment . . . equal [to] the *sum of the Retirement Annuities in force* for him on his Normal Retirement Date." (emphasis added) For a participant electing early retirement, his annuity payment would equal "the *sum of the Retirement Annuities in force* for him on his Early Retirement Date", multiplied by a reduction factor. (emphasis added) Finally, the contract stated,

"No Member or other payee will be entitled to receive any payment resulting from a particular Retirement Annuity unless the full payment for that Retirement Annuity has been received by the Aetna and applied to purchase that Retirement Annuity."

**3.** For example, if the employee entered the Plan on June 1, 1967 earning $7,000 annually, with 10 years prior service he would be entitled to a *yearly* annuity payment on retirement of $350.00: (½% of $7,000 times 10 years).

**4.** The Plan also provided an early retirement option and widow's annuity benefits if the employee died before his 65th birthday.

**5.** No further retirement annuities would be purchased once the total *monthly* amount of retirement annuities purchased for one individual reached $1667.00.

**6.** Looked at another way, the same $340.80 premium which would purchase a $120 yearly future service retirement annuity for the 30-year-old male employee in the first example, would only purchase a future service retirement annuity worth $98.16 for the 30-year-old female employee. In the second example, the $874.80 premium which purchased a $120 yearly future service retirement annuity for the 50-year-old female employee would purchase a $147.00 yearly future service retirement annuity for her 50-year-old male counterpart.

**7.** The cost figures were contained in actuarial tables in the group annuity contract.

Benefits vested under the contract when a participant completed fifteen years of continuous service with the Company, and reached 50 years of age.

On November 27, 1974, Gray-Grimes closed its plant and dismissed its employees. At that time the Plan did not have sufficient assets to pay all the benefits promised. On February 27, 1976, the Company filed with the applicant, Pension Benefit Guaranty Corporation (PBGC), a notice of intent to terminate the Plan. On June 17, 1980, PBGC requested the Company to pay it $34,904.44, the amount by which PBGC claimed the Plan's guaranteed benefits exceeded the value of the Plan's assets allocable to such benefits on November 27, 1974. Gray-Grimes did not pay as requested.

PBGC filed this action on October 8, 1980 against Gray-Grimes Tool Co., Elway P. Gray, an officer, director and sole shareholder of Gray-Grimes, and Last Word Sales Co., a sole proprietorship owned by Gray. Count I asked the court to declare the Plan terminated as of November 27, 1974, and to appoint PBGC the statutory trustee of the Plan under 29 U.S.C. § 1342(b). Count II sought judgment against the respondents for $34,904.44, pursuant to 29 U.S.C. §§ 1362, 1368.

On February 26, 1981, without opposition from respondents, the court ordered the Plan terminated, established the date of termination as of November 27, 1974, appointed PBGC as trustee of the Plan, and ordered the records and assets of the Plan turned over to PBGC, thus resolving Count I of the complaint.

On June 16, 1981, PBGC moved for summary judgment on Count II of the complaint. Gray-Grimes and the other respondents replied and cross-moved for summary judgment on June 25, 1981, asking the court to declare the Plan a "defined-contribution" or "individual account" plan within the meaning of 29 U.S.C. § 1002(34), and thus not insured by PBGC by virtue of 29 U.S.C. § 1321(b)(1). As the § 1321(b)(1) affirmative defense was first raised in respondents' amended answer, also filed June 25, 1981,

the court gave the parties additional time for discovery and briefing.

On November 3, 1981, the court heard oral argument on the cross-motions for summary judgment. The court rejected respondents' contention that the Plan was a "defined-contribution" plan, ruling that the Plan was a "defined-benefit" plan and thus covered by Title IV of ERISA, 29 U.S.C. § 1321(a). However, the court questioned whether certain Plan benefits were guaranteed and asked the parties to further brief that issue.

The court is now prepared to elaborate on its November 3, 1981 bench ruling, and to decide which of the Plan's benefits are guaranteed by the PBGC.

DISCUSSION

The Pension Benefit Guaranty Corporation is a wholly-owned United States government corporation established by § 4002(a) of ERISA, 29 U.S.C. § 1302(a). Among other things, the PBGC is charged with administering the pension plan termination insurance program established by Title IV of ERISA. The purpose of this program is to provide timely and uninterrupted payment of pension benefits to participants and beneficiaries. 29 U.S.C. § 1302(a)(2). To this end, Title IV established four revolving funds which are available to pay guaranteed benefits. 29 U.S.C. § 1305(a), (b)(2)(A).

In turn, Title IV makes any employer who maintained a covered plan at the time it was terminated liable to PBGC for the lesser of

(1) the excess of—

(A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

(B) the current value of the plan's assets allocable to such benefits on the date of termination, or

(2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of ter-

mination, computed without regard to any liability under this section.[8]

29 U.S.C. § 1362(b).

The PBGC is, of course, empowered to sue to recover this liability. 29 U.S.C. §§ 1302(b)(1), 1368(d)(1).

However, the PBGC only guarantees payment of benefits for those pension plans covered by the statute. Section 1322(a) provides:

Subject to the limitations contained in subsection (b) of this section, the corporation shall guarantee the payment of all nonforfeitable benefits ... under the terms of a plan which terminates at a time when section 1321 of this title applies to it.

In turn, § 1321 provides in pertinent part:

(a) Except as provided in subsection (b) of this section, this section applies to any plan ... which, for a plan year—

(1) is an employee pension benefit plan (as defined in paragraph (2) of section § 1002 of this title) established or maintained—

(A) by an employer engaged in commerce or in any industry or activity affecting commerce...

which [is qualified under the Internal Revenue Code].[9]

"Employee pension benefit plan" is defined in § 1002(2) as:

[A]ny plan, fund, or program which was heretofore or is hereafter established or

maintained by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(A) provides retirement income to employees ... regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

■ Thus, if a plan falls within the broad coverage of § 1321(a), and if the plan's benefits are nonforfeitable within the meaning of the § 1322(a), then those benefits are guaranteed by the PBGC. Therefore, the first issue before this court is whether the Gray-Grimes Pension Plan is covered by § 1321(a).

A. *Statutory Coverage of the Plan*

The coverage provided by Title IV of ERISA is very broad. Section 1321(a) states: "Except as provided in subsection (b) of this section, this section applies to *any plan....*" Subsection (b), in turn, carves out a number of narrow exceptions to the coverage of Title IV. In particular, subsection (b)(1) excludes any plan "which is an individual account plan, as defined in paragraph (34) of section 1002 of this title." Thus, Title IV extends to all pension plans, except for those plans which fall squarely within the narrow exceptions set forth in § 1321(b).

---

**8.** PBGC has alleged that 30% of the net worth of Gray-Grimes Tool Co. and other trades or businesses under common control, including Last Word Sales Co., on any date not more than 120 days prior to Nov. 27, 1974, was greater than $34,904.44. Thus, PBGC asserts that respondents' liability should be determined under 29 U.S.C. § 1362(b)(1). The court does not today resolve this issue.

**9.** The complaint alleges that the Plan is a defined benefit plan as described in § 1321(a) and covered by the plan termination insurance program established by Title IV of ERISA. The court finds that this sufficiently alleges the elements of § 1321(a), and that it is not necessary for PBGC to specifically allege that the employer is "engaged in commerce or in any industry or activity affecting commerce" or that the plan has "met the requirements of part I of

subchapter D of chapter 1 of title 26 for the preceding 5 plan years."

Furthermore, the court finds that there is no genuine issue of fact as to these two elements of § 1321(a). Gray-Grimes originally admitted, in response to request for admissions, that the Plan was a defined benefit plan described by § 1321(a). When it later argued in its amended answer and cross-motion for summary judgment that the Plan was a "defined contribution plan", rather than a "defined benefit plan", it did not make an issue of the remaining elements of § 1321(a). Therefore, the court finds that Gray-Grimes has admitted 1) that it is an employer "engaged in commerce or in any industry or activity affecting commerce", and 2) that the Plan has "met the requirements of part I of subchapter D of chapter 1 of title 26 ... for the preceding 5 plan years."

Gray-Grimes argues that its Plan is an "individual account plan" within the meaning of § 1321(b)(1). "Individual account plan" is defined in 29 U.S.C. § 1002(34):

The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

This statutory definition contains two elements.

The first requirement is that a plan must provide for an individual account for each participant. The second requirement is that a participant's benefit must be based solely on the amount in his account. *Connolly v. PBGC*, 581 F.2d 729, 733 (9th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

*PBGC v. Defoe Shipbuilding Co.*, 639 F.2d 311, 313 (6th Cir. 1981); *Concord Control, Inc., v. UAW*, 647 F.2d 701, 704–05 (6th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981); *PBGC v. Roth*, No. 79–10292 (E.D.Mich.), *aff'd*, 667 F.2d 1027 (6th Cir. 1981).

The reason for the exemption from Title IV coverage for the "individual account" or "defined contribution" plan is simple.

Because benefits in individual account plans are based solely upon the amount contributed to the account, such a plan can never be underfunded and there is nothing for PBGC to insure. A participant is entitled to no more than the amount of benefits in his account. *PBGC v. Defoe Shipbuilding Co., supra*, at 313.

This is a fair statement of the rationale for exempting "individual account plans" from Title IV coverage. *See* Legislative History of the Employee Retirement Income Security Act of 1974, at 1149 (1976); *Connolly v. PBGC, supra*, at 733. However, it is not a test for determining when a plan is an individual account plan, as respondents attempt to argue.

Under the statutory scheme, a pension plan which is not a "defined contribution plan" is a "defined benefit plan."

The term "defined benefit plan" means a pension plan other than an individual account plan. . . .

29 U.S.C. § 1002(35).

Clearly, "defined benefit plan" includes more than pension plans which promise fixed benefits. Rather, so long as a pension plan does not fall within the narrow definition of an "individual account plan", it is considered a "defined benefit plan." Upon careful examination, the court determines that the Gray-Grimes Pension Plan is a "defined benefit plan", not an "individual account" or "defined contribution" plan.

First, the Plan did not provide for a separate individual account for each participant. Rather, the Plan provided that all premiums paid by Gray-Grimes were to be pooled in one common fund or account maintained by Aetna on behalf of all Plan participants. Under § 4A–3 of the contract, at the end of each Plan year Aetna would calculate the "net credit balance or net debit balance" for the entire annuity contract, by taking into consideration "all Contractholder Credits arising and payments made to the Aetna during the contract year, all amounts due the Aetna, and the net credit or debit balance from the previous year." Under § 4D–2, at the end of each Plan year Aetna would determine the premiums required to purchase all future service retirement annuities for all participants during that year. Depending on whether the amount required for those premiums exceeded or fell short of the "total payment" made to Aetna, Gray-Grimes would then be entitled to a credit or be obligated to make additional contributions to the insurance company.

Thus, Aetna maintained one general account for all the participants covered under the Plan, not a separate account for each participant. The group annuity contract referred to the "account of the Contractholder"—not to the accounts of individual participants; it provided that contributions were to be used to purchase annui-

ties for all participants, and did not target them for the accounts of specific individuals; and, the level of premiums was calculated by considering the benefit entitlement of all participants and the payments previously made on behalf of all participants, and not by reference to individual accounts.

■ Respondents argue that the annuity record cards maintained by Aetna for each individual participant prove that the Plan provided for individual accounts. However, such record cards, by themselves, prove nothing. Even under a defined benefit plan, the plan trustee must keep records of the credited service of participants in order to determine their benefit entitlement. In *Connolly*, the Ninth Circuit specifically found that a pension plan qualified as a "defined benefit plan", and thus was covered under Title IV, notwithstanding that the trustees of the plan maintained "a record of contributions received on behalf of a participant." 581 F.2d at 733.

Second, the Plan did not provide for benefits based solely upon the amount contributed to each participant's account. Instead, the Plan promised benefits based on the participants' years of service with the Company and their annual earnings. The Plan nowhere defines benefits in terms of the eventual balance in any individual account.

The contract did state that the amount of pension benefits payable to a participant shall equal "the sum of the Retirement Annuities *in force* for him at his Normal Retirement Date." (emphasis added) It also provided in § 4C–2 that:

> No Member or other payee will be entitled to receive any payment resulting from a particular Retirement Annuity unless full payment for the Retirement Annuity has been received by the Aetna *and applied to purchase that Retirement Annuity.*

From this respondents argue that "in force" means paid for, and thus that the benefits provided by the Plan are dependent on the level of funding.

■ Respondents' argument begs the question. "In force" is what is at issue and

a number of courts have considered and rejected the contention that a disclaimer of employer liability for unpaid or unpurchased benefits operates to reduce those benefits or convert the plan into a "defined contribution plan." *Nachman Corp. v. PBGC*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *Concord Control, Inc. v. UAW, supra; PBGC v. Defoe Shipbuilding Co., supra; A–T–O, Inc. v. PBGC*, 634 F.2d 1013 (6th Cir. 1980); *Connolly v. PBGC, supra.* In all these cases, the courts held that plan provisions similar to the ones relied on by respondents merely disclaimed direct *employer* liability for the payment of pension benefits, and did not impose a condition on the benefits promised by the *pension plans.* Furthermore, the courts found that, notwithstanding the presence of these employer liability disclaimers, the pension plans still constituted "defined benefit plans" and were covered under Title IV.

The Gray-Grimes Tool Co. Retirement Plan is a classic example of a "defined benefit plan." There was one contract, one account, and essentially only one premium. Benefit levels were fixed by the terms of the Plan and the contributions required of Gray-Grimes were contingent upon those benefit levels. Furthermore, the Plan does not differ materially from the plans found to be "defined benefit plans" in *Connolly, Defoe Shipbuilding* and *Concord Control.*

In *Connolly*, the pension plan was a collectively-bargained, *multi-employer* plan, effectuated through a trust-fund arrangement. Benefits were determined by multiplying an actuarily-determined pension factor by pension credits (time worked after initiation of the plan) and prior service credits (time worked before initiation of the plan). Contributions were determined for each employer by multiplying a collectively-bargained rate by the employee's hours worked. Records were kept of the contributions made on behalf of each employee, but the contributions themselves went into a general trust fund. The Ninth Circuit found that the plan did not provide for individual accounts since employer contributions were pooled in a general fund. It found that benefits were not determined

solely by reference to the amount in an individual account since the plan provided a benefit formula based primarily on the amount of time worked.

In *Defoe Shipbuilding*, the plan required employer contributions at a fixed rate per employee per working hour. Benefit levels were initially fixed, but were subject to adjustment when actuarial analysis revealed that the benefit levels were no longer appropriate in relation to the level of contributions. Notwithstanding the apparently "fixed" nature of the contributions and the apparently "unfixed" nature of the benefits, the Sixth Circuit found that the plan was not a "defined contribution plan".

Finally, in *Concord Control*, the plan is described as providing benefits determined by multiplying a participant's years of credited service by fixed dollar amounts. The employer was required to pay into a trust fund specific amounts for each hour worked by a participating employee. The court found that this arrangement was not an "individual account plan."

 Although Gray-Grimes Plan did not result from collective bargaining negotiations, and was effectuated through a group annuity contract rather than through a trust arrangement, neither of these factors distinguishes it from the plans found not to be "defined contribution plans" in the cases discussed above. For purposes of Title IV of ERISA, whether a pension is collectively bargained or not, and whether the plan is operated through a trust, annuity contract, or some other arrangement, is simply irrelevant.

Therefore, having determined that the Plan is covered by the termination insurance provisions of Title IV of ERISA, 29 U.S.C. § 1321(a), the court must now determine which of the Plan's benefits were guaranteed by the PBGC.

### B. *Guaranteed Benefits*

Section 1322(a) of Title 29 provides:

Subject to the limitations contained in subsection (b) of this section, the corporation shall guarantee the payment of *all*

*nonforfeitable benefits* (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under the terms of a plan which terminates at a time when section 1321 of this title applies to it. (emphasis added)

The court has just determined that § 1321 applied to the Plan. No contention is made that any of the exceptions set forth in § 1321(b) apply to any of the benefits promised by the Plan. Therefore, in order to determine which of the Plan's benefits were guaranteed by the PBGC, the court must decide which benefits were "nonforfeitable" within the meaning of § 1322(a).

A "nonforfeitable benefit" is now defined for purposes of Title IV of ERISA, in 29 U.S.C. § 1301(a)(8):

"[N]on forfeitable benefit" means, with respect to a plan, a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this Act (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this Act or the Internal Revenue Code of 1954.

However, this definition did not appear in ERISA at the time the Gray-Grimes Plan terminated on November 27, 1974. Section 1301(a)(8) was added by § 402(a)(1)(E) of the Multi-employer Pension Plan Amendments Act of 1980, Pub.L.No.96–364, 94 Stat. 1208 (1980), and became effective Sept. 26, 1980 by virtue of § 108(c)(1) of that Act. 29 U.S.C. § 1461(e)(1).

The Code of Federal Regulations also defines "nonforfeitable":

For the purposes of this part, a benefit payable with respect to a participant is considered to be nonforfeitable, if on the date of termination of the plan the participant (or beneficiary) has satisfied all of the conditions required of him under

the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit that returns all or a portion of a participant's accumulated mandatory employee contributions upon his or her death. 29 C.F.R. § 2613.6(a) (formerly 29 C.F.R. § 2605.6(a)).

However, this regulation, as respondents correctly point out, first appeared in the Federal Register, at 40 Fed.Reg. 43510, on Sept. 22, 1975, nearly ten months after the Plan terminated. This regulation and § 1301(a)(8) were obviously intended to remedy a glaring statutory defect, i.e., ERISA's failure to define "nonforfeitable" for purposes of Title IV.

Thus, only one definition of "nonforfeitable" is arguably applicable to the Plan at the time it terminated on Nov. 27, 1974— the definition contained in 29 U.S.C. § 1002(19):

> The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participants' service, which is unconditional, and which is legally enforceable against the plan. . . .

Respondents urge the court to adopt this definition of "nonforfeitable", citing *Nachman Corp. v. PBGC*, 592 F.2d 947 (7th Cir. 1979), aff'd., 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). The problem with this argument is threefold. First, § 1002(19) was enacted as part of Title I of ERISA, and the Title I definitions are not necessarily applicable to Title IV because they are limited by the introductory phrase, "For purposes of this title." 29 U.S.C. § 1002; *Nachman Corp. v. PBGC*, 446 U.S. 359, 370, 100 S.Ct. 1723, 1731, 64 L.Ed.2d 354 (1980).

Second, although the Seventh Circuit agreed that the Title I definition of "nonforfeitable" should govern the construction of that term's use in Title IV, it also concluded that the Code of Federal Regulations definition, then 29 C.F.R. § 2605.6(a), was consistent with the Title I definition. 592 F.2d at 952–53.[10]

Third, the Supreme Court, in affirming the Seventh's Circuit decision in *Nachman*, pointed out that the definitions contained in Title I of ERISA were expressly *not* made applicable to Title IV. It also noted that there were other indications in the legislative history and in the structure of the Act that Congress did not intend for the Title I definitions to apply elsewhere. 446 U.S. at 370–71, 100 S.Ct. at 1730–31. Thus, respondents' contention that the Title I definition of "nonforfeitable" is controlling here seems to be untenable.

However, although "nonforfeitable" is thus left without a definition, the court is not left without directions.

The Nachman pension plan was terminated on Dec. 31, 1975, at a time when the Code of Federal Regulations definition of "nonforfeitable" was arguably applicable to it. Nevertheless, in its majority opinion, the Supreme Court assumed, *arguendo*, that the Title I definition of "nonforfeitable" controlled, and still held that the pension benefits promised in the Nachman plan were "nonforfeitable."

The Court first examined the language of 29 U.S.C. § 1002(19) and concluded that for a benefit to be "nonforfeitable", "it is the claim to the benefit, rather than the benefit itself, which must be 'unconditional' and 'legally enforceable against the plan' ". 446 U.S. at 371, 100 S.Ct. at 1731. Thus, the "nonforfeitable" character of a participant's rights is *not* to be "determined by focusing on whether the employer is liable for any deficiency in the fund's assets." *Id.*

---

10. Although the Nachman pension plan is not fully described in the Seventh Circuit's opinion, it appears to have included language disclaiming employer liability similar to the disclaimer language in the Gray-Grimes Tool Co. Plan. In spite of the employer's disclaimer, the Seventh Circuit concluded that the plan's benefits were "nonforfeitable" and thus guaranteed by the PBGC.

The Court then carefully examined the legislative history of ERISA and concluded that employer disclaimers of direct liability were not intended to render *otherwise vested benefits* "forfeitable" within the meaning of 29 U.S.C. § 1322(a).[11]

Finally, the Court determined that the orderly phase-in of ERISA, designed by Congress to have an increasingly severe impact on employers, would be distorted were the Court to accept the argument that "nonforfeitable" benefits were only those benefits for which the employer was not directly liable.

All three of these considerations led the majority to conclude that the provision of the Nachman pension plan which disclaimed employer liability for further contributions in the event of a plan termination did not render the otherwise vested benefits promised by the plan "forfeitable" within the meaning of 29 U.S.C. § 1322(a).[12]

There is a clear line of judicial authority in the Sixth Circuit following *Nachman. A–T–O, Inc. v. PBGC*, 634 F.2d 1013 (6th Cir. 1980); *PBGC v. Defoe Shipbuilding Co.*, 639 F.2d 311 (6th Cir. 1981); *Concord Control, Inc. v. UAW*, 647 F.2d 701 (6th Cir.), cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981).

In *A–T–O*, the pension plan terminated on Nov. 30, 1974. The plan provided for a fixed monthly retirement benefit for each year of continuous service. Employees received full credit for each year of service before the plan's inception. The plan also contained an employer disclaimer of liability clause similar to that found in *Nachman*.[13] Under these circumstances, the court relied squarely on *Nachman* in holding that the A–T–O pension plan benefits were "nonforfeitable" within the meaning of § 1322(a).

*Defoe Shipbuilding Co.* reached the same conclusion on similar facts. The Defoe plan provided for a fixed level of benefits, subject to readjustment upon the recommendation of an actuary.[14] The plan disclaimed employer liability beyond the amount contributed to the trust fund.[15] Again, *Nachman* was held to be dispositive:

---

11. "Throughout the entire legislative history . . . the terms 'vested' and 'nonforfeitable' were used synonymously . . . [Thus] it is reasonable to infer that the term 'nonforfeitable' was intended to describe benefits that were generally considered 'vested' prior to the statute. And it is clear that the normal usage in the pension field was that even if the actual realization of expected benefits might depend of the sufficiency of plan assets, they were nonetheless considered vested."

"There is no evidence that Congress intended to exclude otherwise vested benefits from the insurance program solely because the employer had disclaimed liability for any deficiency in the pension fund. . . ."

"Petitioner's reading of the statute would limit any meaningful application of the insurance program prior to January 1, 1976, to only those cases involving insolvent employers that had not disclaimed direct liability . . . This argument, however, is foreclosed by a consideration of the statutory provisions for successive increases in the burdens associated with plan terminations. Congress clearly did not offer employers an opportunity to make cost-free terminations at any time prior to January 1, 1976. Quite the contrary, one of the express purposes of ERISA was to discourage plan terminations." 446 U.S. at 376–82, 100 S.Ct. at 1733–36.

12. The relevant provision of the Nachman pension plan reads as follows:

Benefits provided for herein shall be only such benefits as can be provided by the assets of the fund. In the event of termination of this Plan, there shall be no liability or obligation on the part of the Company to make any further contributions to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid.

446 U.S. at 365, 100 S.Ct. at 1728.

13. The disclaimer clause provided:

Payments made in accordance with this Section 10 shall be in complete discharge of the Company's financial obligation under this Agreement. The Pension benefits of this Agreement shall be only such as can be provided by the assets of the Pension Trust and there shall be no further liability or obligation on the Company to make any further contributions to the Pension Trust for any reasons.

634 F.2d at 1019.

14. It is unclear from the court's opinion whether the pension plan at issue in *Defoe* provided for past service benefits.

15. The disclaimer clause provided:

In the event of termination of the Plan . . . accrued benefits shall be nonforfeitable to the extent funded. . . .

In *Nachman Corp. v. PBGC* ... the Supreme Court held that ... the full amount of benefits vested in participants of a plan is nonforfeitable, and hence full payment is guaranteed by PBGC. This conclusion was reached despite the existence of a provision limiting the benefits to the amount of assets in the fund, similar to those ... found in Defoe's Plan... The clauses in the Plan limiting Defoe's liability and limiting the benefits to the extent funded are overridden by the provisions in ERISA identifying the nonforfeitable benefits guaranteed by PBGC. 639 F.2d at 314.

Finally, in *Concord Control*, the same three-judge panel that decided *A–T–O* held that a limitation of liability clause did not prevent the "benefits [promised by the Concord Control plan] from being characterized as 'nonforfeitable' under Title IV of ERISA." [16] 647 F.2d at 705. Like the Plan at issue here, the Concord Control plan promised retirement for past service.

■ In light of the foregoing decisions, this court is compelled to hold that both the future service retirement benefits and the past service retirement benefits, vested under the terms of the Gray-Grimes Plan, are "nonforfeitable" and thus guaranteed by the PBGC under Title IV of ERISA. 29 U.S.C. § 1322(a).

■ Section 4C–2 of the Plan provided that:

No Member or other payee will be entitled to receive any payment resulting from a particular Retirement Annuity unless full payment for the Retirement Annuity has been received by the Aetna and applied to purchase that Retirement Annuity.

This disclaimer clause is the functional equivalent of the disclaimer clauses found in the Nachman, A–T–O, Defoe Shipbuilding and Concord Control pension plans. The language of 4C–2 simply limits the extent to which benefits could be *collected* from the Plan. It does not qualify the employees' *rights* against the Plan. Therefore, benefits, which were otherwise *vested* under the terms of the Plan, did not become "forfeitable" by virtue of the disclaimer language of section 4C–2 of the Plan. *Nachman v. PBGC, supra; A–T–O, Inc. v. PBGC, supra; PBGC v. Defoe Shipbuilding Co., supra; Concord Control, Inc. v. UAW, supra.*

However, respondents do not stop here. They go on to argue that the court should look beyond the disclaimer clause to the language defining benefits. In other words, respondents would have the court expand the definition of "nonforfeitable", at least as it applies to this case, beyond the simple concept of "vesting." The court believes this is superfluous after *Nachman.* However, even if the court acquiesces in this exercise, it is clear that both the future service and the past service benefits are promised by the Plan, and thus "nonforfeitable" under any definition of the word.

Section 3A–1 of the contract provides that, "A future Service Retirement Annuity *shall be purchased* each month for each Active Member in the Eligible Class."[17]

---

Deposits by the Company with the Trustee of contributions computed in accordance with Section 1 of this Article shall be in complete discharge of the Company's financial obligation under the Plan. The Company shall have no liability in respect to payments under the Plan except to pay over to the Trustee such contributions ... Each employee or retired employee ... shall look solely to the Trust Fund for any payments or benefits under the Plan.
639 F.2d at 312.

16. The exact wording of the employer disclaimer of liability clause does not appear in the court's opinion.

17. "Eligible Class" is defined in § 2A–3 as "an employee in the service of the Contractholder [Gray-Grimes]."

The definition of an Active Member is slightly more complicated. Section 2A–1(a) states:
An Active Member is an employee who is in the service of the Contractholder ... who has met the requirements for becoming an Active Member stated in subsection 2B, and who has not reached his Normal Retirement Date.

Section 2B, in turn, gives two classes of Active Members. Those who were employed by Gray-Grimes on the date the Plan went into effect were Active Members if they were less than 65 years old. Those hired after the date the Plan

(emphasis added) Respondents concede, correctly, that future service benefits are promised. Under any definition, these benefits are "nonforfeitable."

On the other hand, § 3B–1 provides: "Each person who becomes an Active Member on the Effective Date is *eligible* for a Past Service Retirement Annuity." (emphasis added) Respondents argue that this language, coupled with the language of the Plan making Company contributions for Past Service Retirement Annuities discretionary,[18] make these benefits "forfeitable" and thus not guaranteed by the PBGC, since these benefits are not promised by the Plan. Respondents rely on footnote 8 of Justice Stevens' majority opinion in *Nachman*, 446 U.S. 365 n.8, 100 S.Ct. 1728 n.8, to argue that the Plan's language defines benefits, a situation, respondents argue, which distinguishes this case from *Nachman.*

Footnote 8 of Justice Stevens' opinion is merely a refutation of Justice Stewart's effort in dissent to consider provisions of the Nachman plan out of context. It has no application to this case.

Furthermore, it is crystal clear that the Gray-Grimes pension plan *does* promise Past Service Retirement Annuities. The plain meaning of § 3B–1 is that every person who has satisfied two requirements, i.e., being (a) an Active Member (b) on the Effective Date, is entitled to past service benefits.[19] There is no suggestion that eligibility for past service benefits was in any way conditioned on the Company's contributions. Section 4E of the Plan, which makes the timing of contributions for past service benefits discretionary with the Company, is simply irrelevant. It deals only with the employer's obligation to make contributions to the Plan, not the entitlement of participants to benefits under the Plan.

Again, regardless of which definition of "nonforfeitable" is applied, the Past Service Retirement Annuities are clearly "nonforfeitable" and thus guaranteed by the PBGC. 29 U.S.C. § 1322(a). All benefits *vested* under the terms of the Plan, both future service benefits and past service benefits, are "nonforfeitable" and thus guaranteed by PBGC.

Therefore, as there is no genuine issue as to any material fact and as the applicant Pension Benefit Guaranty Corporation is entitled to judgment as a matter of law, Fed.R.Civ.P. 56(c), PBGC's motion for summary judgment is GRANTED and respondents' cross-motion for summary judgment is DENIED.

So ordered.

---

went into effect became Active Members essentially after working continuously for Gray-Grimes for one year.

**18.** Section 4E–1 provided: "The Contractholder may make Contractholder Contributions for Past Service Retirement Annuities at such times and in such amounts as the Contractholder determines, subject to the following rules. . . ."

**19.** There is nothing magical about the word "eligible." The plans at issue in *Concord Control, Inc. v. UAW, supra,* and *PBGC v. Roth, supra,* both contained provisions stating that participants would be "eligible" for certain benefits. Nevertheless, both those courts concluded that the benefits were "nonforfeitable" and thus guaranteed under Title IV of ERISA.