**ESSEX GROUP, INC.,**
**Plaintiff-Appellant,**

**v.**

**Richard G. NILL, Defendant-Appellee.**

**No. 3-383A92.**

Court of Appeals of Indiana,
Third District.

May 10, 1984.

Alan Ver Planck, Barrett, Barrett & McNagny, Fort Wayne, for plaintiff-appellant.

Edward L. Murphy, Jr., Grant F. Shipley, Livingston, Dildine, Haynie & Yoder, Fort Wayne, for defendant-appellee.

GARRARD, Judge.

In 1961 Richard Nill (Nill), president of Fort Wayne Tool & Die, negotiated a trust agreement (Plan) to provide retirement and death benefits to salaried employees of the company. The Plan provided these benefits from two funds, a General Fund and an Auxiliary Fund. The employer contributed to the General Fund in sufficient amounts to purchase insurance policies in order to provide death benefits if a participant in the Plan died prior to retirement. The employer also contributed amounts to the Auxiliary Fund sufficient to convert the insurance policies into annuities upon a participant's retirement.

In 1970, Essex Group, Inc. purchased Fort Wayne Tool & Die, Inc. and assumed responsibility for the Plan. In 1976, Nill retired prior to his normal retirement date. At that time, the Plan Trustee had credited the Auxiliary Fund with $55,244.40 in excess of the amount necessary to convert Nill's insurance policy into an annuity. Thereafter, Nill sought to receive these excess funds. The Plan Trustee brought a complaint against Nill and Essex seeking a declaratory judgment regarding the status of this money in the Auxiliary Fund.[1]

Essex appeals from a partial summary judgment in favor of Nill. The trial court held that the Essex Group, Inc. Pension Plan was a "hybrid plan," i.e. a combination defined benefit plan (the General Fund) and an individual account plan (the Auxiliary Fund) as defined in 29 U.S.C. Section 1002(35).[2]

The trial court determined that Nill had an individual account in the Auxiliary Fund. The court reasoned that since 29 U.S.C. Section 1002(23) defined an accrued benefit in an individual account plan as the balance of an individual's account and under Section 1002(35) the Plan's Auxiliary Fund was to be treated as an individual account, Nill had a right to the entire amount allocated for his annuity conversion. The court also reasoned that in balancing the equities, a decision for Essex would result in a windfall to it since Fort Wayne Tool & Die had contributed to the pension plan from 1961–1970.

The threshold question for us is whether the Plan is a "hybrid plan" and Nill had an individual account in the Auxiliary Fund so that he had a right to the entire amount allocated in it for his annuity conversion.

■ The determination of the nature of benefits due under the Plan must be derived from the Plan itself, from the *Plan definitions* of the benefit and its manner of *funding*. *Connolly v. PBGC* (9th Cir. 1978), 581 F.2d 729. The purpose of the Plan is to provide retirement income for the life of a participant or its equivalent if the participant dies prior to retirement. This purpose is implemented through the use of two funds: the Auxiliary Fund, from which funds are taken to pay for converting a participant's insurance policies into annuities; and the General Fund, from which money is withdrawn to purchase insurance policies on the lives of participants. The benefit contemplated by the Plan is either lifetime retirement income or its equivalent in death benefits.

■ Nill maintains that the critical aspect of the Plan is that it creates individual accounts. He points to Art. II entitled

---

1. The Plan Trustee, Indiana Bank & Trust Company, is not an active party to this appeal.

2. "(35) The term 'defined benefit plan' means a pension plan other than an individual account plan; except that a pension plan which is not an individual account plan and which provides a benefit derived from employer contributions which is *based* partly on the balance of the separate account of a participant—

\* \* \* \* \* \*

(B) for the purposes of paragraph (23) of this section and section 1054 of this title, shall be treated as an individual account plan to the extent benefits are *based* upon the separate account of a participant and as a defined benefit plan with respect to the remaining portion of benefits under the plan."
(emphasis supplied)

"General Statement as to Purpose" which states that the Auxiliary Fund and its investments must be "accumulated for the account of each individual...." This, he maintains, reveals how contributions and accruals are to be "credited" to each participant's account. A closer reading of Art. II reveals that "the *Auxiliary Fund* shall be credited with payments to the Trust which are to be invested by the Trustee and accumulated for the account of each individual *so that* at the normal retirement date the Trustee shall have sufficient funds on hand to pay the Insurance Company the premium necessary to convert the policy previously procured for the participant." (emphasis supplied) It is the Auxiliary Fund which is credited and the individual's resulting benefit from those contributions is limited to receiving what the Plan contemplates i.e. conversion of an insurance policy into an annuity.

As further evidence of an intent to create individual accounts, Nill points to Plan language delineating use of the Auxiliary Fund should the General Fund be inadequate to provide the full death benefit. The Trustee is directed to "pay to the participant's beneficiary as much of the auxiliary fund deposits plus accumulations to the credit of such participant at the date of his death which when added to the death benefit will amount to one hundred times the amount of his normal monthly pension." Section 6:04. Nill maintains "to the credit of such participant" in this section signifies intent to establish an individual account. We cannot agree. If the participant did indeed have full rights to the amount credited to him, he should be entitled to receive the full amount at death as well as at retirement. Here, again, the Plan limits a participant's interest. In the case of death, it is limited to a death benefit equal to 100 times his normal monthly pension. He does not receive the entire amount credited to him in the Auxiliary Fund.

Finally, Nill argues that the Trustee is to keep a separate record of the amount deposited to the Auxiliary Fund to the account of each participant, together with any accruals thereto although no actual segregation of investments for each account is required. Nill maintains that this directive, plus the right given to a participant to inspect the Trustee's records, combine to reveal an intention that a participant has the right, upon retirement, to disbursement of the auxiliary funds in "his" account.

Essex maintains that separate records, and significantly *not* separate accounts, are maintained to insure that the trustee provides sufficient funds to serve the purpose of the Plan, i.e. conversion of the participant's insurance into an annuity. Separate record keeping for each participant not only reduces the chance of error, confusion, or mistake resulting in insufficient funding for a participant, but it facilitates the ability of each participant to verify the sufficiency of the Fund earmarked for conversion of his insurance policy to an annuity.

Further evidence that the Plan does not contemplate individual accounts may be derived from definitions under the Federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001, *et seq.* In order to treat the Auxiliary Fund as an individual account plan under 29 U.S.C. Section 1002(35), the benefits must be based partly on the balance in a participant's separate account. However, here the benefit to be received by Nill, i.e. an annuity, is not *based* in any fashion on the balance in the Auxiliary Fund. The amount of the annuity is based on the amount of insurance purchased according to the Plan's fixed formula in Sections 6:01, 5:01 and 5:02.[3] The Plan contemplates a

---

**3.** "Upon receipt of an employee's executed application for participation the Trustee shall apply for and purchase from the Insurance Company a life insurance policy upon the life of such participant containing an annuity option, in an amount which will, upon the exercise of such option and payment to the insuror of the additional premiums specified therein, provide the monthly retirement income provided for such participant as calculated in Article V hereof. The Trustee shall apply for an additional policy or policies whenever a participant becomes enti-

defined benefit, i.e. an annuity or its equivalent in a death benefit, funded by the employer in whatever amount necessary to provide the benefit.[4]

There is only *one* benefit provided at retirement: an annuity based on the amount of insurance purchased with funds determined by a fixed formula. As such, the Plan constitutes a defined benefit plan rather than a hybrid plan. The Auxiliary Fund merely serves as a reservoir which contains at the *minimum* funds necessary to convert insurance into an annuity. Logically, then, it may be implied that an excess amount could exist. What then does the Plan provide with respect to any excess?

The primary reason for confusion regarding this Plan is that it contains no express provision for disbursement to individuals of any excess in the Auxiliary Fund except upon plan termination. While this case does not involve a plan termination, Nill argues that "[t]he only question is whether the Employees must await plan termination (upon the retirement of the last employee, or earlier if the Employer elects) to receive this dispursement [sic], or whether a disbursement of the individual account upon retirement was anticipated. Since the overall purpose of the Trust Agreement is to provide benefits upon retirement, it would seem counterproductive to hold that the retiree, who must look to his pension benefits in lieu of employment, must await some unknown future event in order to receive that which is demonstrably his." (Appellee's brief at 13).

Our reading of the Plan definitions and the Plan itself (*Connolly, supra*) reveals that a retiree is not intended to eventually receive any additional funds upon plan termination. Plan Section 14:04 states, in pertinent part:

"The balance, if any, in the auxiliary fund shall be distributed among the *participants on the date of termination* of the Trust in the ratio that the reserve liability for each participant shall bear to the total of the reserves for all participants under the plan. The Trustee's determination of the amount allocable to each individual shall be conclusive." (emphasis supplied).

"Participant" is defined in Section 3:06 as an employee qualified to participate in the trust and on whose life a policy has been issued. An "employee" is defined in Section 3:05 as any salaried person regularly employed on a full-time basis. While the definition of "policy" in Section 3:07 includes an annuity contract, a retiree is no longer a regularly employed full time employee. Upon termination of the plan, the amount remaining in the Auxiliary Fund will be distributed among those people who continue to be regularly employed on a full time basis who have qualified as participants as of the date the Plan terminates. This would *not* include retirees.

Significantly, the employees would not receive amounts in "their" individual "accounts," which would occur if these were vested accrued benefits to which they had a "right." They are to receive money from

---

tled to an additional pension pursuant to the provisions of Article V.

5:01 The normal pension payable to a retired participant under this trust shall be an annuity which provides monthly payments commencing on the participant's normal retirement date and continuing thereafter throughout his lifetime with the guarantee that no less than 120 monthly payments shall be made.

5:02 The monthly amount of a participant's normal pension shall be computed as follows:

(1) Each employee eligible to participate shall receive a benefit at his normal retirement date equal to 20% of the first $400 of monthly compensation plus 40% of the earnings in excess of $400 per month.

(b) A participant's normal pension benefit shall be reduced 1/15 for each year of service less than 15 years at the normal retirement date."

4. "8.04 In determining the amount required for deposit in the Auxiliary Fund to accumulate sufficient to make the conversions at retirement the Trustee may accept the actuarial computations of the insurance company or the Trustee may make such computations assuring such interest rate and such discounts for probable mortality and employment terminations of participants as it deems prudent and which will be acceptable to the Commissioner of Internal Revenue."

the Auxiliary Fund "in the ratio that the reserve liability for each participant shall bear to the total of the reserves for all participants under the plan." Section 14:04. The amount, if any, each participant would receive depends on the amount of income the Auxiliary Fund has accumulated. Any amount in excess of the employer contributions is distributed pro rata among participants. This is not a characteristic of an individual account.

In addition, Section 13:01, entitled "No reversion to Employer" states that the employer shall not use funds for any purpose other than for the *exclusive* benefit of *employees*. By definition within the Plan, this excludes retirees and cannot be a basis for Nill receiving anything more than the Plan intends, i.e. an annuity.

Moreover, Section 7:04 states that upon retirement the trustee arranges for the conversion of insurance to annuities and delivers the policy to the participant who then *ceases* to be a party to the trust. Therefore, a retiree is no longer a participant and will not share in any distribution of funds from the Auxiliary Fund upon termination of the Plan.

Nill argues that when Section 8:05 states that a participant shall have no interest prior to retirement or death it implies that they *do* have an interest once they retire. Their interest, however, is limited to what the Plan is designed to provide: an annuity which will pay them a lifetime of retirement benefits.

Finally, with respect to a balance of the equities, Essex points to the fact that Nill is taking an early retirement. The Plan is designed to adjust his benefit to take this into account by paying to him the present value of his benefit due at his normal retirement date. To disburse to Nill the entire amount earmarked in the Auxiliary Fund exceeds the purpose of the Plan and in fact would serve to *encourage* rather than penalize those who decide to retire early. This is counterproductive and goes beyond any express or implied purpose inherent in the Plan.

In *In re C.D. Moyer Co. Trust Fund* (E.D.Pa.1977), 441 F.Supp. 1128, the employer overfunded a pension plan and subsequent to plan termination sought to enforce a plan amendment allowing the return of excess funds to it. After holding that the amendment was valid, the court noted that the result was consistent with policy under ERISA. Employers who continue to fund plans under ERISA should not be penalized for overfunding due to overcaution or miscalculation of an actuary. "Thus, employees will continue to be protected to the extent of their specific benefits, but will not receive any windfalls due to the employer's mistake in predicting the amount necessary to keep the Plan on a sound financial basis." *C.D. Moyer, supra*, at 1133. The same policy under ERISA is applicable to the situation here. Nill has no reasonable expectation of acquiring any interest, at present or in the future, in any excess in the Auxiliary Fund. Any distribution of it to him would be a windfall. Essex should not be penalized for overfunding especially where the Plan was not intended to distribute any excess to retirees like Nill.

Accordingly, we reverse the court below with directions to enter judgment for Essex.

Reversed and remanded.

STATON, P.J., and HOFFMAN, J., concur.